IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CLINTON WAGNER,

      Plaintiff,                      No. 2: 09-cv-3166 FCD KJN P

     vs.

MOSS POSNER, et al.,               <u>AMENDED</u>

      Defendants.            <u>FINDINGS & RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Plaintiff is a state prisoner proceeding without counsel with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court are plaintiff's motions for injunctive relief filed March 25, 2010, and April 1, 2010. (Dkt. Nos. 17 and 18.) Plaintiff alleges that he suffers from hepatitis B. Plaintiff requests that he be transferred to a prison that is able to provide him with the special diet he requires. Plaintiff also requests that he receive "immediate follow up care specialist examination" by either CT, MRI or liver biopsy.

        On August 6, 2010, defendants filed an opposition to plaintiff's motions for injunctive relief. (Dkt. No. 46.) On August 27, 2010, defendants were ordered to file further briefing addressing plaintiff's motions. (Dkt. No. 49.) On September 4, 2010, defendants filed the further briefing. (Dkt. No. 50.)

1

On October 6, 2010, the undersigned recommended that plaintiff's motions be denied. (Dkt. No. 58.) In his objections, filed October 26, 2010, plaintiff discussed medical treatment he had received since defendants filed their opposition and further briefing. (Dkt. No. 63.) On November 17, 2010, defendants filed a reply containing new evidence. (Dkt. No. 70.) Based on the additional evidence presented by both plaintiff and defendants in their pleadings filed after the findings and recommendations were issued, the undersigned issues these amended findings and recommendations to address this new evidence.

After carefully considering the record, the undersigned recommends that plaintiff's motions for injunctive relief be denied.

II. Legal Standard for Injunctive Relief

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009), quoting Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374 (2008).

A Ninth Circuit panel has found that post-Winter, this circuit's sliding scale approach or "serious questions" test survives "when applied as part of the four-element Winter test." Alliance for Wild Rockies v. Cottrell, 2010 WL 3665149, at * 5 (9th Cir. Sept. 22, 2010) "In other words, 'serious questions going to the merits,' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met." Id.

In cases brought by prisoners involving conditions of confinement, any preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2).

////

III. <u>Legal Standard For Eighth Amendment Claim</u>

In order to state a Section 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. <u>Wilson v. Seiter</u>, 501 U.S. 294, 299 (1991); <u>McKinney v. Anderson</u>, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." <u>Hudson v. McMillian</u>, 503 U.S. 1, 4 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., <u>Wood v. Housewright</u>, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); <u>Hunt v. Dental Dept.</u>, 865 F.2d 198, 200-01 (9th Cir. 1989); <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059-60 (9th Cir. 1992), <u>overruled on other grounds</u>, <u>WMX Technologies v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Of course, negligence is insufficient. <u>Farmer</u>, 511 U.S. at 835. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. <u>Id</u>. at 836-37. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. <u>Id</u>. at 842.

Deliberate indifference is nothing less than recklessness in the criminal sense—subjective standard—disregard of a risk of harm of which the actor is <u>actually</u> aware. <u>Id</u>.

1  at 838-42. "[T]he official must both be aware of facts from which the inference could be drawn
2  that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.
3  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and
4  disregards that risk by failing to take reasonable measures to abate it." Id. at 847. "[I]t is enough
5  that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."
6  Id. at 842. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk.
7  Id. at 840-42. However, obviousness per se will not impart knowledge as a matter of law.

8        Moreover, a physician need not fail to treat an inmate altogether in order to violate
9  that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.
10 1989). A failure to competently treat a serious medical condition, even if some treatment is
11 prescribed, may constitute deliberate indifference in a particular case. Id.

12       However, also significant to the analysis is the well established principle that mere
13 differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth
14 Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,
15 662 F.2d 1337, 1344 (9th Cir. 1981).

16       Additionally, mere delay in medical treatment without more is insufficient to state
17 a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766
18 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is
19 no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing
20 Wood v. Housewright, 900 F.2d 1332, 1339-40 (9th Cir. 1990), and Hudson, 503 U.S. at 4. A
21 finding that an inmate was seriously harmed by the defendant's action or inaction tends to
22 provide additional support for a claim of deliberate indifference; however, it does not end the
23 inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the
24 medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those
25 needs, the more likely it is that a plaintiff has established deliberate indifference on the part of
26 the defendant." McGuckin, 974 F.2d at 1061.

IV. <u>Defendants' Evidence</u>

In the opposition, defendants argue that plaintiff has not demonstrated that he is likely to suffer irreparable harm. In support of this argument, defendants refer to the declaration of defendant Dr. Nangalama attached to the opposition. In his declaration defendant Dr. Nangalama states, in relevant part,

> 3. Hepatitis B is an infectious illness that causes an inflammation of the liver. Most people who get hepatitis B will get it for a short time and then get better. This is called acute hepatitis B. Sometimes, however, the patient will suffer a long-term infection called chronic hepatitis. The common symptoms of hepatitis B are very similar to the flu. A patient may suffer sleepiness, mild fever, headache, lack of appetite, upset stomach, stomach pain, diarrhea, muscle aches, joint pain and skin rash. Hepatitis B is generally diagnosed by a blood test.
>
> 4. Treatment of hepatitis B depends on how active the virus is and whether the patient is at risk for liver damage such as cirrhosis. In most cases, particularly in acute cases, hepatitis B will go away on its own with little or no treatment necessary. Home treatment will be used to relieve symptoms and help prevent spread of the virus. In long-term (chronic) infection, treatment includes monitoring the condition and using antiviral medicines to prevent liver damage. The goal of treatment is to stop liver damage by preventing the virus from multiplying. If hepatitis B has severely damaged the patient's liver, a liver transplant may be considered.
>
> 5. Antiviral medicine is typically used if the hepatitis B virus is active and the patient is at risk for liver damage. This medicine slows the ability of the virus to multiply. Commonly-prescribed antiviral medicine for hepatitis B includes: Interferons (such as inteferon alfa-2b and pegylated interferon alfa-2a) and Nucleoside reverse transcriptase inhibitors (NRTIs) (such as adefovir, entecavir, lamivudine and telbivudine).
>
> 6. When it is believed that the hepatitis B may have caused liver damage, a needle will be used to take a tiny sample of the liver for testing. This is called a liver biopsy. This test is typically necessary once a diagnosis of liver damage has been made.
>
> 7. In patients with hepatitis B, it is important that they eat right and drink plenty of liquids. A patient will generally only require a special diet, however, in very extreme circumstances. These circumstances would be indicated by a substantial loss of weight, signs of malnutrition, inability to keep food down, and a general failure of the patient to thrive.

5

8. Chronic hepatitis B can lead to cirrhosis of the liver. Cirrhosis is characterized by replacement of liver tissue by fibrosis (excess connective tissue), scar tissue, and regenerative nodules (lumps that occur as a result of a process in which damaged tissue is regenerated), leading to loss of liver function. The damage that results increases the risk for liver cancer. A variety of tests are used to determine whether a patient may be suffering from liver cancer. These include a CT-scan, MRI, an ultrasound of the liver, liver function tests, and blood tests (including an alph-fetoprotein (AFP test). Several liver function tests assess liver function by evaluating excretion (e.g bilirubin) or the liver's synthetic capability (usually reported as the international normalized ratio or INR).

9. When a patient's liver is inflamed, liver enzymes (transaminases) will leak out of the liver and into the blood stream, causing transaminases blood levels to be elevated. Thus, an effective way of determining the severity of a hepatitis B patient's liver condition is to examine the transaminases levels.

10. It is my understanding that Wagner is seeking a transfer to a prison able to provide him with a special diet and also requesting that he receive follow-up medical care by either a CT, MRI or liver biopsy. A transfer to obtain a special diet is not medically necessary at this time. Furthermore, Wagner has already undergone numerous CT scans. To the extent that specialists have or will recommend further such tests, those recommendations have and will be acted upon.

11. I have been involved in Wagner's medical care on numerous occasions. This has included regular follow-ups with him on June 8, 2009, June 26, 2009, August 21, 2009, October 11, 2009, November 5, 2009, and December 28, 2009. One of my examinations of Wagner took place on February 18, 2010. Prior to this examination, I reviewed Wagner's medical chart to remind myself of his medical history. Attached hereto as Exhibit "A" are true and correct copies of pertinent portions of Wagner's medical chart that I reviewed during my examination of Wagner on February 18, 2010. These records were received, reviewed, made, and kept in the ordinary course of my employment with the CDCR.

12. My review of Wagner's medical chart showed that he had undergone a CT scan related to his hepatitis B on January 20, 2009. (Ex. "A", pgs. 1366-1367) He underwent another CT scan related to his hepatitis B on May 19, 2009. (Ex. "A", pgs. 1388-1390) These CT scans had found advanced liver cirrhosis but no evidence of cancer. I also noted that he had a current prescription for Baraclude (trade name for entecavir) to treat his hepatitis B. (Ex. "A", p. 1192)

13. During my examination of Wagner on February 18, 2010, it

was noted that Wagner, who is six-foot-three inches tall, weighed 215 pounds. For a man his height, this is a normal healthy weight. He reported that he was eating well and that his weight was stable. He denied any nausea or vomiting. Based on these factors, there was no indication that Wagner required any sort of special diet. The diagnosis was hepatitis B and I noted that he was on medications. His AFP was stable at 2.7 (normal is less than 6.1) which indicated that liver cancer was not a concern.

*****

15. My next examination of Wagner occurred on March 12, 2010. Prior to conducting this examination, I reviewed his medical records to learn what had occurred in his medical treatment since my previous examination of Wagner. Attached hereto as Exhibit "C" is a true and correct copy of pertinent portions of Wagner's medical chart that I reviewed prior to my examination of him on March 12, 2010. These records were received, reviewed, made and kept in the ordinary course of my employment with the CDCR.

16. Wagner had been seen at UC Davis for a speciality consultation with the heptologist on February 24, 2010. (Ex. "C", pgs. 1411-1415) It was noted that his current medications included Baraclude. He was diagnosed with cirrhotic stage liver disease. It was noted, however, that his INR and bilirubin levels were normal. Thus, no referral for transplantation was necessary. It was also noted that his transaminases levels had significantly improved with the Baraclude treatment. Finally, it was found that his hepatitis B viral load, which had been positive in 2009, was now negative after being placed on Baraclude. This would indicate that the hepatitis B virus was no longer detectable in Wagner's system. Because Wagner had a history of enhancing liver lesions, the consultant believed that a CT of the abdomen was warranted. She therefore ordered a 4 phase CT of the abdomen along with AFP testing. The consultant noted that Wagner had brought up the issue of a liver biopsy. The consultant, however, did not think it was necessary, since there was a clear diagnosis and Wagner was responding well to his antiviral treatment.

17. During my examination of Wagner on March 12, 2010, I noted that he had been seen by the consultant at UC Davis, and that a CT had been ordered. I noted that the results of his liver function tests showed improvement. I also reviewed and refilled his medications. Finally, I ordered that a follow up occur in four to six weeks. At the time of this examination, Wagner weighed 227 pounds. Once again, this was a healthy weight and not indicative of the type of malnutrition that would necessitate a special diet or a transfer to another prison where a different diet is available.

*****

7

> 19. On April 16, 2010, I completed a referral on Wagner's behalf to UC Davis radiology for the CT scan that had previously been ordered by the consultant at UC Davis...
>
> 20. Wagner's current medical condition is clinically stable. He has received extensive treatment for his hepatitis B, including regular follow-ups and medication that is successfully treating his condition. His latest test results indicate that his current course of treatment has been successful and that his condition is almost back to normal.
>
> 21. To the extent that outside consultants have recommended that Wagner undergo a CT scan, or any other similar test, those recommendations will and have been followed and referrals for those tests will and have been completed. Because CT scans and other similar tests cannot be performed at CSP-Sac, they must be completed at outside facilities. When the tests are performed, therefore is dependent upon that facility's schedule.

On August 27, 2010, defendants were ordered to inform the court of the status of the CT scan and AFP testing ordered for plaintiff by the heptologist at UC Davis on February 24, 2010. On September 4, 2010, defendants informed the court that the AFP test was completed on May 24, 2010. The CT scan was performed on May 27, 2010.

In his October 26, 2010 objections to the original findings and recommendations, plaintiff states that on October 4, 2010, he was seen by Dr. Torok at the UC Davis Medical Center who diagnosed him with both cirrhotic stage liver disease secondary to hepatitis B and hepatitis B. Plaintiff states that Dr. Torok recommended that plaintiff follow a low salt and normal protein diet. Plaintiff argues that based on this recommendation, he should be transferred to a prison that can provide him with a low salt diet.

In their reply to plaintiff's objections, defendants attach a declaration by defendant Dr. Nangalama addressing the treatment plaintiff has received for hepatitis B since the filing of their opposition and further briefing. Defendant Dr. Nangalama states, in relevant part,

> 3. I have been involved in Wagner's medical care on numerous occasions in the last two years. One of my examinations of Wagner took place on June 3, 2010. During this examination, I noted that his most recent lab tests had shown improving liver function tests (LFT) and that his alpha-fetaprotein (AFP) test was

2.2, which is normal. He denied any nausea, vomiting, or diarrhea and his weight was stable at a healthy 215 pounds. I diagnosed him with liver cirrhosis due to Hepatitis B. I described the condition as stable and noted that his Hepatitis B viral load was undetectable. I reviewed his medications, noting that he had a current prescription for Entecavir (Baraclude). I ordered lab tests and a follow-up examination.

*****

5. I next examined Wagner on June 24, 2010. I noted that Wagner was doing well. His most recent lab tests showed improved liver function and that his cirrhosis was stable. The plan was to continue with the antiviral medication he was receiving, for a follow-up, and for lab tests so as to continue to monitor his condition.

*****

7. My next examination of Wagner occurred on August 9, 2010. I noted that Wagner had a history of Hepatitis B and its complications but that he was getting better. Wagner denied any fever, diarrhea, or constipation. He had no nausea or vomiting. He was currently taking Baraclude. His recent viral load showed that the Hepatitis B was undetectable. A CT scan had been performed on May 27, 2010, and found no hepatocellular carcinoma. A review of his lab tests showed that his left LFTs were improved. The plan was to continue with the current medication, including a refill of his Baraclude, lab tests to monitor his condition, and a follow-up.

*****

9. I examined Wagner again on September 20, 2010. I noted that he had a history of Hepatitis B with liver cirrhosis. Wagner denied any new medical issues. My assessment was liver cirrhosis for which he was on the antiviral medication Baraclude and that he was doing well. The plan was a referral for an EGD and to the Hepatologist for a consultation. I also ordered lab tests so as to monitor his condition and for a follow up.

*****

11. I next examined Wagner for a regular follow up on October 14, 2010. Prior to this examination, I reviewed Wagner's medical chart to familiarize myself with developments in his care since I had last seen him. Attached hereto as Exhibit "E" are pertinent portions of Wagner's medical chart that I reviewed prior to my examination of him on October 14, 2010. These records were received, reviewed, made and kept in the ordinary course of my employment with the CDCR.

9

> 12. My review of Wagner's medical chart showed that he had been seen for a consultation with the Hepatitis specialist on October 4, 2010. (Ex. "E", pgs. 1619-1621.) The specialist noted that there was no evidence of hepatocellular carcinoma on Wagner's CT scans. (Ex. "E", p. 1620.) She recommended a diet normal in protein and with low salt. (Ex. "E", p. 1612.) Upon return to the prison, an order was then written that he should avoid salt in his diet. (Ex. "E", p. 1438.)
>
> 13. During my examination of Wagner on October 14, 2010, I noted his history of liver cirrhosis due to chronic Hepatitis B. I further noted that his LFT was improved. The plan was for a regular follow up...
>
> *****
>
> 14. Wagner's current medical condition is clinically stable. He has received extensive treatment for his hepatitis B, including regular follow-ups and medication that is successfully treating his condition. His latest test results indicate that his current course of treatment has been successful and that his condition is almost back to normal. His liver function tests show great improvement and his Hepatitis B viral load is virtually undetectable.
>
> 15. It is my understanding that Wagner is seeking a transfer to a prison able to provide him with a special diet. A transfer to obtain a special diet is not medically necessary at this time as Wagner's condition is stable and near normal. His weight is stable and at a healthy level. The recommendation that Wagner have a diet low in salt would not necessitate a transfer of Wagner to a different prison or a medical facility. Instead, such a recommendation merely depends upon the patient to monitor his own salt intake by not adding extra salt to foods and by avoiding foods that are high in salt content.

(Dkt. No. 70-1, at 2-5.)

V. <u>Analysis</u>

The expert evidence submitted by defendants demonstrates that plaintiff does not require a special diet for his hepatitis. While in October 2010 the hepatitis specialist recommended a low salt diet for plaintiff, defendant Dr. Nangalama states that plaintiff may obtain this diet by monitoring his own salt intake. Plaintiff has presented no expert evidence suggesting that he cannot monitor his own salt intake or that he requires transfer to a prison that can provide him with a special diet, low salt or otherwise.

10

The expert evidence submitted by defendants also demonstrates that plaintiff recently received a CT scan and does not require a liver biopsy. Defendants' evidence demonstrates that they have not been deliberately indifferent to plaintiff's need for medical treatment for his hepatitis B. Plaintiff has presented no expert evidence demonstrating that he requires a liver biopsy or that defendants have otherwise acted with deliberate indifference to his need for treatment for his hepatitis B.

On September 3, 2010, plaintiff filed a letter with the court in support of his pending motions. Attached to this letter are relatively recent letters addressed to plaintiff from the Prison Law Office. These letters discuss communications between the Prison Law Office and prison officials regarding the treatment plaintiff received for hepatitis B. These letters discuss much of the treatment addressed in Dr. Nangalama's declaration and do not suggest that plaintiff's treatment has been inadequate.

Plaintiff's motions for injunctive relief should be denied because he has not demonstrated a likelihood of success on the merits. In addition, plaintiff has not demonstrated that he is likely to suffer irreparable harm in the absence of injunctive relief, that the balance of equities tips in his favor or that an injunction is in the public interest.

Accordingly, IT IS HEREBY RECOMMENDED that plaintiff's motions for injunctive relief (Dkt. Nos. 17 and 18) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are

////

////

1  advised that failure to file objections within the specified time may waive the right to appeal the
2  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
3  DATED:  November 24, 2010

                                                  KENDALL J. NEWMAN
                                                  UNITED STATES MAGISTRATE JUDGE

wag3166.pi(2)