1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CLINTON WAGNER,

11          Plaintiff,                    No. 2: 09-cv-3166 KJM KJN P

12      vs.

13   MOSS POSNER, et al.,

14          Defendants.          FINDINGS & RECOMMENDATIONS

15   _____/

16   I.  Introduction

17          Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action

18   pursuant to 42 U.S.C. § 1983.  This action is proceeding on the amended complaint filed July 28,

19   2010, as to defendants O'Brien, McAlpine, Nangalama, Sahota and Bal.  (Dkt. No. 43.)  Plaintiff

20   alleges that he received inadequate medical care for Hepatitis B.

21          Pending before the court is defendants' summary judgment motion filed May 6,

22   2011.  (Dkt. No. 76.)  Defendants argue that they did not violate plaintiff's Eighth Amendment

23   rights.  Defendants also argue that they are entitled to qualified immunity.

24          On December 30, 2011, plaintiff filed an opposition.  (Dkt. No. 104.) On January

25   19, 2012, the undersigned ordered plaintiff to file further briefing clarifying his claims.  (Dkt. No.

26   106.)  On February 9, 2012, plaintiff filed this further briefing.  (Dkt. No. 107.)

1   After carefully reviewing the record, the undersigned recommends that

2   defendants' summary judgment motion be granted, except for the claim that defendant

3   Nangalama did not timely prescribe antiviral medications.

4   II.  Standards for Summary Judgment

5   Summary judgment is appropriate when a moving party establishes that the

6   standard set forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should

7   be rendered if . . . there is no genuine issue as to any material fact, and that the movant is

8   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

9   > Under summary judgment practice, the moving party
10  > always bears the initial responsibility of informing the district court
    > of the basis for its motion, and identifying those portions of "the
    > pleadings, depositions, answers to interrogatories, and admissions
11  > on file, together with the affidavits, if any," which it believes
    > demonstrate the absence of a genuine issue of material fact.

12

13  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

14  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

15  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

16  file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

17  upon motion, against a party who fails to make a showing sufficient to establish the existence of

18  an element essential to that party's case, and on which that party will bear the burden of proof at

19  trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the

20  nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such a

21  circumstance, summary judgment should be granted, "so long as whatever is before the district

22  court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

23  satisfied."  Id.

24   If the moving party meets its initial responsibility, the burden then shifts to the

25  opposing party to establish that a genuine issue as to any material fact actually exists.  See

26  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

1  establish the existence of such a factual dispute, the opposing party may not rely upon the

2  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

3  form of affidavits, and/or admissible discovery material, in support of its contention that the

4  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

5  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

6  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

7  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

8  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

9  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

10  1436 (9th Cir. 1987).

11          In the endeavor to establish the existence of a factual dispute, the opposing party

12  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

13  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

14  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

15  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

16  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

17  committee's note on 1963 amendments).

18          In resolving a summary judgment motion, the court examines the pleadings,

19  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

20  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

21  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

22  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

23  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

24  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

25  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

26  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

1   show that there is some metaphysical doubt as to the material facts . . .  Where the record taken

2   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

3   'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

4   III.  Legal Standard for Eighth Amendment Claim

5               Generally, deliberate indifference to a serious medical need presents a cognizable

6   claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

7   punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511

8   U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison

9   official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that

10   risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is

11   less stringent in cases involving a prisoner's medical needs than in other cases involving harm to

12   incarcerated individuals because 'the State's responsibility to provide inmates with medical care

13   ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974

14   F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled

15   on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

16   Specifically, a determination of "deliberate indifference" involves two elements:  (1) the

17   seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to

18   those needs.  McGuckin, 974 F.2d at 1059.

19               First, a "serious" medical need exists if the failure to treat a prisoner's condition

20   could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id.

21   (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for

22   medical attention include the existence of an injury that a reasonable doctor or patient would find

23   important and worthy of comment or treatment; the presence of a medical condition that

24   significantly affects an individual's daily activities; or the existence of chronic and substantial

25   pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

26   (9th Cir. 1990)).

1   Second, the nature of a defendant's responses must be such that the defendant

2   purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

3   "deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate

4   indifference may occur when prison officials deny, delay, or intentionally interfere with medical

5   treatment, or may be shown by the way in which prison physicians provide medical care.

6   Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate

7   indifference to be established, there must first be a purposeful act or failure to act on the part of

8   the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant must

9   purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for

10   deliberate indifference to be established."  Id.  Second, there must be a resulting harm from the

11   defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate

12   further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

13   Mere differences of opinion concerning the appropriate treatment cannot be the

14   basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996);

15   Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to

16   treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v.

17   City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious

18   medical condition, even if some treatment is prescribed, may constitute deliberate indifference in

19   a particular case.  Id.

20   In order to defeat defendants' motion for summary judgment, plaintiff must

21   "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809

22   F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an

23   excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S.

24   at 837).

25   ////

26   ////

5

1   IV.   Qualified Immunity

2              "'Qualified immunity shields federal and state officials from money damages

3   unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional

4   right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'"

5   Hunt v. County of Orange, 2012 WL 432297 at *7 (9th Cir. Feb. 13, 2012) (quoting Ashcroft v.

6   al-Kidd, 131 S. Ct. 2074, 2080 (2011)).   "A Government official's conduct violates clearly

7   established law when, at the time of the challenged conduct, 'the contours of a right are

8   sufficiently clear' that every 'reasonable official would have understood that what he is doing

9   violates that right.'"   Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (internal alterations

10  omitted).

11             Although the court was once required to answer these questions in order, the

12  United States Supreme Court has clarified that "while the sequence set forth there is often

13  appropriate, it should no longer be regarded as mandatory."   Pearson v. Callahan, 555 U.S. 223,

14  236 (2009).   In this regard, if a court decides that plaintiff's allegations do not make out a

15  statutory or constitutional violation, "there is no necessity for further inquiries concerning

16  qualified immunity."   Saucier v. Katz, 533 U.S. 194, 201 (2001).   Likewise, if a court determines

17  that the right at issue was not clearly established at the time of the defendant's alleged

18  misconduct, the court may end further inquiries concerning qualified immunity without

19  determining whether the allegations in fact make out a statutory or constitutional violation.

20  Pearson, 555 U.S. at 236–42.

21             In resolving the question of qualified immunity, the court views the facts in the

22  light most favorable to the plaintiff.   See Schwenk v. Hartford, 204 F.3d 1187, 1198 (9th Cir.

23  2009).

24  V.   Undisputed Facts

25             Defendants submitted a statement of undisputed facts.   Plaintiff did not.   The

26  undisputed facts set forth herein are based on the undersigned's review of defendants' evidence

1  as well as evidence contained in plaintiff's opposition.

2        *Hepatitis B Generally*

3        The following information is taken from the declaration of defendant Nangalama.

4  (Dkt. No. 76-6 at 1-3.):

5        Hepatitis B is an infectious illness that causes an inflammation of the liver.  Most

6  people who contract hepatitis B will get it for a short time and then get better.  This is called

7  acute hepatitis B.  Sometimes, however, the patient will suffer a long-term infection called

8  chronic hepatitis B.

9        The common symptoms of hepatitis B are very similar to the flu.  A patient may

10  suffer sleepiness, mild fever, headache, lack of appetite, upset stomach pain, diarrhea, muscle

11  aches, joint pain and skin rash.

12        Hepatitis B is generally diagnosed by a blood test.  Treatment of hepatitis B

13  depends on how active the virus is and whether the patient is at risk for liver damage such as

14  cirrhosis.  In most cases, particularly in acute cases, hepatitis B will go away on its own with

15  little or no treatment necessary.  Home treatment will be used to relieve symptoms and help

16  prevent spread of the virus.  In long term (chronic) infection, treatment includes monitoring the

17  condition and using antiviral medicines to prevent liver damage.  The goal is to stop liver damage

18  by preventing the virus from multiplying.  If hepatitis B has severely damaged the patient's liver,

19  a liver transplant may be considered.

20        Antiviral medicine is typically used if the hepatitis B virus is active and the

21  patient is at risk for liver damage.  This medicine slows the ability of the virus to multiply.

22  Commonly prescribed antiviral medicine for hepatitis B includes: Interferons (such as interferon

23  alfa-2b and pegylated interferon alfa-2a); and Nucleoside reverse transcriptase inhibitors (NRTIs)

24  (such as adefovir, entecavir, lamivudine and telbivudine).

25        When it is believed that the hepatitis B may have caused liver damage, a liver

26  biopsy may be conducted in which a needle will be used to take a tiny sample of the liver for

1   testing.  This test is typically unnecessary once a diagnosis of liver damage has been made.

2           In patients with hepatitis B, it is important that they eat right and drink plenty of

3   fluids.  A patient will generally only require a special diet in very extreme circumstances.  These

4   circumstances would be indicated by a substantial loss of weight, signs of malnutrition, inability

5   to keep food down, and a general failure of the patient to thrive.

6           Chronic hepatitis B can lead to cirrhosis of the liver.  Cirrhosis is characterized by

7   replacement of liver tissue by fibrosis (excess connective tissue), scar tissue, and regenerative

8   nodules (lumps that occur as a result of a process in which damaged tissue is regenerated),

9   leading to loss of liver function.  The damage that results increases the risk for liver cancer.  A

10  variety of tests are used to determine whether a patient may be suffering from liver cancer.  These

11  include a CT-scan, MRI, an ultrasound of the liver, liver function tests, and blood tests (including

12  an alpha-fetoprotein (AFP) test).  Several liver function tests assess liver function by evaluating

13  excretion (e.g., bilirubin) or the liver's synthetic capability (usually reported as the international

14  normalized ratio or INR).

15          When a patient's liver is inflamed, liver enzymes (transaminases) will leak out of

16  the liver and into the blood stream, causing transaminases blood levels to be elevated.  Thus, an

17  effective way of determining the severity of a hepatitis B patient's liver condition is to examine

18  the transaminases levels.

19          *Plaintiff's Treatment at Corcoran*

20          In 2004 plaintiff was housed at California State Prison-Corcoran ("Corcoran").

21  On August 22, 2004, plaintiff filed an inmate grievance stating that on several occasions he had

22  experienced severe abdominal pain, nausea, vomiting and diarrhea.  (Dkt. No. 104, part 1 at 25.)

23  In the grievance, plaintiff stated that Dr. Nguyen had prescribed medication for these conditions

24  which made his symptoms worse.  (Id.)  Plaintiff requested treatment by an abdominal specialist.

25  (Id. at 26.)

26  ////

1       In 2005, (former defendant) Dr. Posner requested that plaintiff receive a

2  colonoscopy due to a family history of colon cancer.  (Id. at 29.)  On April 18, 2005, Dr. Schuster

3  performed an endoscopy, the results of which were unremarkable.  (Id. at 30.)  The colonoscopy

4  could not be performed because plaintiff was not adequately prepared.  (Id.)  Dr. Schuster felt

5  that plaintiff should still undergo a colonoscopy.  (Id.)  On June 3, 2005, Dr. Schuster performed

6  the colonoscopy.  (Id.)  The results of this procedure are not in the court record.

7       On July 19, 2005, plaintiff had a blood test.  (Id. at 33.)  The results indicated that

8  plaintiff's "SGOT" and "SGPT" levels were high.  (Id.)[1]  In December 2005, a "hepatitis prof"

9  was ordered for plaintiff.  (Id. at 34.)

10         *Defendant O'Brien/Care at Tehachapi*

11       Defendant O'Brien first became involved in plaintiff's care on March 27, 2007.

12  (Dkt. No. 76-4 at 7 of 32.)  It is unclear from the record where plaintiff was incarcerated when

13  defendant O'Brien treated plaintiff, but it appears that it may have been at the California

14  Correctional Institution in Tehachapi, California.  It is relatively clear that plaintiff was not

15  housed at Corcoran when he received treatment from defendant O'Brien.

16       On March 27, 2007, plaintiff was seen by nursing staff regarding complaints of

17  back pain.  (Id.)  Defendant O'Brien did not examine plaintiff on that date, but he was contacted

18  by nursing staff regarding plaintiff's back pain.  (Id.)  Defendant O'Brien made a verbal order for

19  plaintiff to be prescribed Baclofen.  (Id.)

20       Defendant O'Brien saw plaintiff on April 10, 2007, at which time plaintiff

21  complained of visual problems and back pain.  (Id.)  Defendant O'Brien diagnosed plaintiff with

22  visual problems, for which he was awaiting glasses, and a lumbar sprain, for which he prescribed

23  Baclofen.  (Id.)

24       On May 2, 2007, plaintiff underwent lab tests.  (Dkt. No. 76-8 at 11-12.)  It is

25

26       [1] High SGOT and SGPT levels may indicate liver disease.  See
http://www.medicinenet.com/liver_blood_tests/page2.htm.

1    unclear who ordered these tests.  Those lab results showed that plaintiff's creatinine level was

2    high.  (Id.)  Plaintiff was scheduled for a follow-up.  (Dkt. No. 76-4 at 7 of 32.)

3              A high creatinine level is a sign of possible kidney disease.  (Dkt. No. 76-5 at 2 of

4    44.)  A high creatinine level is not related to hepatitis and is not indicative of that disease.[2]  (Id.)

5              On May 23, 2007, defendant O'Brien saw plaintiff again.  (Id.)  Plaintiff

6    complained of scalp dermatitis and acid reflux disease.  (Id.)  Based on the high creatinine level,

7    defendant O'Brien diagnosed plaintiff with borderline renal failure.  (Id.)  Defendant O'Brien

8    ordered a critical case appointment with respect to the borderline rental failure.  (Id.)

9              A urinalysis ordered by defendant O'Brien was conducted on June 20, 2007.

10   (Dkt. No. 76-8 at 9.)  The test found a small amount of bilirubin in the urine.  (Id.)  On July 23,

11   2007, plaintiff underwent another urinalysis test, with the results being normal.  (Id. at 8.)

12             Defendant O'Brien had no further involvement in plaintiff's care.

13             *Defendant McAlpine/Plaintiff's Care at California State Prison-Sacramento*

14             At some during 2007, plaintiff was transferred to California State Prison-

15   Sacramento ("CSP-Sac").  Defendant McAlpine is a licensed physician surgeon who, in 2007

16   and 2008, held the position of physician and surgeon at CSP-Sac.  (Dkt. No. 76-5 at 1.)

17   Defendant McAlpine first became involved in plaintiff's care on September 5, 2007, when he

18   examined plaintiff due to complaints of tendinitis and bursitis.  (Id.)

19             Defendant McAlpine next saw plaintiff on October 12, 2007, and diagnosed him

20   with gastritis, a seizure disorder and renal insufficiency.  (Id. at 2.)  Gastritis is an extremely

21   common medical condition in which the lining of the stomach becomes inflamed.  (Id.)  It has

22

23         [2]  In his opposition, plaintiff disputes defendants' expert evidence that high creatinine
     levels and renal insufficiency are not related to hepatitis and are not indicative of that disease.  In
     support of this claim, plaintiff refers to a booklet from the National Digestive Diseases
24   Information Clearinghouse.  (Dkt. No. 104 at 38 (Exhibit F).)  Plaintiff claims that this booklet
     states that cirrhosis can cause kidney failure.  Although difficult to read, it appears that the
25   booklet states that cirrhosis can cause kidney and lung failure.  (Id. at 42.)  This statement in this
     booklet is not admissible expert evidence that renal insufficiency is related to hepatitis B.   In any
26   event, this booklet does not state that kidney failure is indicative of hepatitis B.

many different causes, the most common being diet and the use of various medications, such as nonsteroidal anti-inflammatory drugs ("NSAIDs"). (Id.) It is commonly treated with antacids, such as Maalox or various medications that reduce the amount of acid produced by the stomach, such as Ranitidine. (Id.) If a medication is the suspected cause, then the patient will also customarily be told to avoid that medication. (Id.) Defendant McAlpine gave plaintiff a prescription for Ranitidine and Maalox for gastritis, and discontinued his prescription for the NSAID Celebrex. (Id.) Seizures are typically treated with the use of anti-convulsant medications such as Keppra, for which defendant McAlpine gave plaintiff a prescription. (Id.) Renal insufficiency is a sign of possible kidney disease. (Id.) The best treatment for renal insufficiency is to avoid the cause of the insufficiency. (Id.) A frequent cause of renal insufficiency is also the use of NSAIDS such as Celebrex. (Id.)

Defendant McAlpine next saw plaintiff on December 17, 2007. (Id.) At that time, plaintiff stated that his stomach complaints had improved.[3] (Id.) The examination otherwise focused on treatment of plaintiff's Achilles tendon.

Defendant McAlpine continued to treat plaintiff regularly over the next six months for a variety of medical conditions including gastritis, Achilles tendinitis and plaintiff's seizure disorder. (Id. at 3.)

On June 26, 2008, defendant McAlpine again examined plaintiff. (Id.) Plaintiff complained of spontaneous onset of swelling of both legs, ankles and feet, and edema that did not go down at night. (Id.) Defendant McAlpine diagnosed plaintiff with possible deep vein thrombosis. (Id.) Defendant McAlpine gave plaintiff an injection of the anti-inflammatory Toradol to relieve the pain and signed an order to send plaintiff to the hospital. (Id.)

---

[3] In his opposition, plaintiff claims that the 7362 Health Care Request form dated December 17, 2007, shows that plaintiff stated that his pain level was a ten and that his stomach pains were sharp and stabbing. Plaintiff states that these documents are attached to his opposition as exhibit G. The undersigned has reviewed plaintiffs' exhibit G, which is a Health Care Request form dated December 4, 2007. (Dkt. No. 104, part 1 at 48 of 68.) This document states that plaintiff had pain in his feet, but makes no mention of stomach pain.

1        Plaintiff was initially to go to UC Davis, but they would not accept him, so he was

2 sent to Mercy Folsom Hospital instead.  (Id.)  On June 26, 2008, plaintiff was seen at Mercy

3 Folsom Hospital for an evaluation of bilateral ankle swelling.  (Id.)  Chronic heart failure and

4 deep vein thrombosis were ruled out, but a liver function test was abnormal and it was

5 recommended that plaintiff have a follow-up visit regarding those results.  (Id. at 3-4.)

6        Defendant McAlpine next saw plaintiff on July 1, 2008.  (Id. at 3.)  During this

7 examination, defendant McAlpine noted that plaintiff was on Spironolactone, a medication to

8 treat fluid retention.  (Id. at 4.)  Based on the abnormal liver function test, a variety of lab results

9 were ordered, including a Hepatitis panel and an alpha-fetoprotein ("AFP") test.  (Id.)  Defendant

10 McAlpine also ordered that plaintiff continue with the Spironolactone for treatment of edema in

11 his feet and ankles.  (Id.)

12        Defendant McAlpine next saw plaintiff on July 14, 2008.  (Id.)  At this time,

13 plaintiff complained of nausea, a common symptom of hepatitis B.  (Id.)  Defendant McAlpine

14 prescribed Phenergan, which is a medication commonly prescribed for the treatment of nausea.

15 (Id.)  Defendant McAlpine's assessment was acute hepatitis based on the report from Mercy

16 Folsom Hospital.  (Id.)  Defendant also wrote an order that plaintiff come back the following

17 morning for his pending lab results.  (Id.)

18        Defendant McAlpine next saw plaintiff on July 15, 2008.  (Id.)  Before the

19 examination, defendant reviewed the results of the latest lab tests.  (Id.)  These results showed

20 that plaintiff was positive for hepatitis B.  (Id.)  During this examination, plaintiff reported that

21 he was having decreased nausea and stated that his appetite was "okay."  (Id. at 5.)  Defendant

22 ordered an ultrasound.  (Id.)

23        Defendant McAlpine was not again involved in plaintiff's care because defendant

24 was transferred to another institution.  (Id.)

25        The ultrasound ordered by defendant McAlpine on July 15, 2008, was performed

26 on September 22, 2008.  (Id.)  The results showed small lesions on the liver and it was

1 recommended that the results be correlated with a CT scan of the liver.  (Id.)

2 *Defendant Nangalama/Plaintiff's Care at CSP-Sac*

3 Defendant Nangalama is a licensed physician and surgeon at CSP-Sac.  (Dkt. No.

4 76-6 at 1-2.)  Defendant Nangalama first became involved in plaintiff's care when he examined

5 him on October 9, 2008.  (Id. at 3.)  The diagnosis was hepatitis B and the plan was to "continue

6 the current medical treatment."  (Id.)  On that date, defendant Nangalama referred plaintiff for a

7 "CT for a liver biopsy."  (Id.)

8 Defendant Nangalama next saw plaintiff on January 13, 2009.  (Id. at 4.)

9 Defendant noted that plaintiff had a history of hepatitis B that was symptomatic at that time.

10 (Id.)  Plaintiff complained of pain.  (Id.)  Defendant Nangalama requested a consultation with

11 "GI" and the Hepatologist at UC Davis and also requested an abdominal CT scan.  (Id.)

12 Defendant Nangalama next saw plaintiff on January 22, 2009.  (Id.)  At that time,

13 defendant Nangalama noted that plaintiff had lost weight.  (Id.)  Plaintiff had weighed 215

14 pounds on January 13, 2009, and was down to 188 pounds during this examination.  (Id.)

15 However, plaintiff reported no nausea or vomiting.  (Id.)  Plaintiff's medications were reviewed

16 and refilled.  (Id.)  Defendant Nangalama ordered lab tests and prescribed a Carnation nutritional

17 supplement.  (Id.)  Defendant Nangalama noted that plaintiff had undergone the abdominal CT

18 scan two days earlier and that the report was pending.  (Id.)

19 Sometime shortly after the January 22, 2009 examination, defendant Nangalama

20 received and reviewed the results of plaintiff's abdominal CT scan.  (Id.)  The CT scan had been

21 performed on January 20, 2009, at the UC Davis Radiology Clinic.  (Id. at 25.)  The findings

22 were a cirrhotic liver but no evidence of cancer.  (Id.)

23 On February 11, 2009, defendant Nangalama examined plaintiff again.  (Id.)

24 Plaintiff complained of chills, fever and shortness of breath.  (Id.)  Defendant Nangalama

25 diagnosed plaintiff with possible pneumonia, and ordered that he be transferred to the UC Davis

26 Emergency Room.  (Id. at 4-5.)

1      Defendant Nangalama next examined plaintiff on February 20, 2009.  (Id. at 5.)

2  Plaintiff complained of increased abdominal pain but no nausea or vomiting.  (Id.)  An

3  examination found tenderness in the right abdomen.  (Id.)  Plaintiff was diagnosed with hepatitis

4  B and cirrhosis of the liver.  (Id.)  Plaintiff's medications were continued, he was referred for a

5  GI consultation, and he was to have a follow-up in four to five days.  (Id.)

6      Defendant Nangalama saw plaintiff on February 28, 2009.  (Id.)   Defendant

7  Nangalama "noted" that plaintiff was being treated with the anti-viral medication Entecavir

8  (trade name Baraclude), that his weight was stable and that he was clinically stable.  (Id.)

9  Plaintiff was diagnosed with hepatitis B and liver cirrhosis.  (Id.)  The plan was to continue with

10  the treatment.  (Id.)

11      Defendant Nangalama next saw plaintiff on April 7, 2009.  (Id.)  It was noted that

12  plaintiff was clinically stable and had no new medical issues.  (Id.)  Plaintiff was diagnosed with

13  hepatitis B.  (Id.)  Plaintiff was referred to the hepatologist and the plan was to continue his

14  current medications.  (Id.)

15      On April 13, 2009, plaintiff underwent an abdominal ultrasound at UC Davis.  (Id.

16  at 6.)  A CT or an MRI of the liver was recommended.  (Id.)

17      Plaintiff was seen at the UC Davis hepatology clinic on April 24, 2009.  (Id.)

18  Plaintiff stated that he generally felt well.  (Id.)  The diagnosis was a questionable hapatocullular

19  carcinoma.  (Id.)  It was believed that a CT was essential to determine the nature of the lesions on

20  the liver.  (Id.)  Plaintiff was also diagnosed with hepatitis B and cirrhosis, although plaintiff's

21  liver was found to be stable and compensating.  (Id.)

22      Plaintiff was seen at UC Davis on May 11, 2009, for another hepatology clinic

23  consultation.  (Id.)  Plaintiff was diagnosed with liver disease and with nodules on his liver

24  according to the CT and ultrasound.  (Id.)  The recommendation was to repeat the CT or to

25  conduct an MRI to rule out cancer.  (Id.)  Treatment with antivirals medications was also

26  recommended.  (Id.)  It was believed that with anti-viral treatment for the liver disease, a liver

transplant would not be necessary.  (Id.)

An abdominal CT was performed on May 19, 2009.  (Id.)  The test showed liver cirrhosis, but no evidence of cancer.  (Id.)

Defendant Nangalama examined plaintiff on June 8, 2009.  (Id. at 6-7.) Defendant Nangalama noted the results of the most recent CT scan and that plaintiff was clinically stable.  (Id.)  Plaintiff was diagnosed with liver disease, defendant Nangalama ordered Entecavir (Baraclude), and the plan was to continue with the current medical treatment.  (Id. at 7.)

Plaintiff was seen by a nurse practitioner on July 7, 2009, and taken off the Carnation nutritional supplement.  (Id.)  It was noted that plaintiff's body mass index ("BMI") was 28%, his height six feet, and his weight was 196 (or 198) pounds.  (Id.)  Based on these factors, he was of healthy weight and did not meet the criteria for needing a dietary supplement. (Id.)

Defendant Nangalama next examined plaintiff on August 21, 2009.  (Id.) Defendant diagnosed plaintiff with hepatitis B and the plan was to continue with the current treatment, including Baraclude.  (Id.)

Defendant Nangalama next examined plaintiff on October 14, 2009.  (Id.)  He found that plaintiff was doing well.  (Id.)  The diagnosis was still hepatitis B and cirrhosis, and the plan was to continue treatment with Baraclude, lab tests and a follow-up.  (Id.)

Defendant Nangalama next examined plaintiff on November 5, 2009.  (Id. at 8.) Plaintiff's condition was stable, his diagnosis remained the same, and defendant refilled his medications.  (Id.)

Defendant Nangalama next saw plaintiff on December 28, 2009.  (Id.)  Plaintiff's condition was medically stable, the diagnosis was the same, and the plan was to continue with Baraclude, an AFP test, the measurement of his hepatitis B viral load, and a referral to GI.  (Id.)
////

15

1    Defendant Nangalama next saw plaintiff on February 18, 2010.  (Id.)  It was noted

2  that plaintiff weighed a healthy 215 pounds.  (Id.)  For a man his height, this is a normal healthy

3  weight.  (Id.)  Plaintiff reported that he was eating well and that his weight was stable.  (Id.)

4  Plaintiff denied any nausea or vomiting.  (Id.)  Based on these factors, defendant Nangalama

5  determined that plaintiff did not require a special diet.  (Id.)  Plaintiff's AFP was 2.7 (normal is

6  less than 6.1), which indicated that liver cancer was not a concern.  (Id.)

7    Plaintiff was seen at UC Davis for a consultation with the hepatologist on

8  February 24, 2010.  (Id. at 9.)  It was noted that plaintiff's current medications included

9  Baraclude.  (Id.)  Plaintiff was diagnosed with cirrhotic stage liver disease.  (Id.)  It was noted

10  that his INR and bilirubin levels were normal.  (Id.)  Thus, no referral for transplantation was

11  necessary.  (Id.)  It was also noted that plaintiff's transaminases levels had significantly improved

12  with the Baraclude treatment.  (Id.)  Additionally, it was noted that plaintiff's hepatitis viral load,

13  which had been positive in 2009, was now negative.  (Id.)  This finding would indicate that the

14  hepatitis B virus was no longer detectable in plaintiff's system.  (Id.)  Because plaintiff had a

15  history of enhancing liver lesions, the consultant believed that a CT of the abdomen was

16  warranted.  (Id.)  Therefore, the hepatologist ordered a 4 phase CT of the abdomen along with

17  AFP testing.  (Id.)  The consultant noted that plaintiff had brought up the issue of a liver biopsy.

18  (Id.)  The consultant did not think it was necessary because there was a clear diagnosis and

19  plaintiff was responding well to his antiviral treatment.  (Id.)

20    Defendant Nangalama next examined plaintiff on March 12, 2010.  (Id. at 8.)

21  During this examination, defendant noted that plaintiff had been seen by the consultant at UC

22  Davis, that a CT had been ordered, and that the results of his liver function tests showed

23  improvement.  (Id. at 9.)  Plaintiff's medications were reviewed and refilled.  (Id.)  Defendant

24  ordered a follow-up to occur in four to six weeks.  (Id.)  At the time of this examination, plaintiff

25  weighed 227 pounds.  (Id.)  This was a healthy weight.  (Id.)

26  ////

On April 16, 2010, defendant Nangalama completed a referral on plaintiff's behalf to UC Davis radiology for the CT scan that had been previously recommended by the consultant at UC Davis in February.  (Id. at 10.)

Shortly after May 24, 2010, defendant Nangalama received and reviewed the results of the AFP test which plaintiff had undergone.  (Id.)  The results were within normal range.  (Id.)

Shortly after May 27, 2010, defendant Nangalama reviewed and received the results of the CT scan which plaintiff had undergone.  (Id.)  The CT scan found no evidence of cancer.  (Id.)

Defendant Nangalama next examined plaintiff on June 3, 2010.  (Dkt. No. 70-1 at 2.)  During this examination, defendant noted that plaintiff's most recent lab tests had shown improving liver function tests ("LFT") and that plaintiff's alpha-fetoprotein ("AFP") test was 2.2., which is normal.  (Id.)  Plaintiff denied any nausea, vomiting or diarrhea, and his weight was stable at 215.  (Id.)  Defendant diagnosed plaintiff with liver cirrhosis due to hepatitis B.  (Id.)  Defendant described the condition as stable and noted that plaintiff's hepatitis B viral load was undetectable.  (Id.)  Defendant reviewed plaintiff's medications, noting that he had a current prescription for Entecavir (Baraclude).  Defendant ordered lab tests and a follow-up examination.  (Id.)

Defendant Nangalama next examined plaintiff on June 24, 2010.  (Id.)  Defendant noted that plaintiff was doing well.  (Id.)  Plaintiff's most recent lab tests showed improved liver function and that his cirrhosis was stable.  (Id.)  The plan was to continue with the antiviral medication he was receiving, for a follow-up, and for lab tests so as to continue to monitor his condition.  (Id.)

Shortly after June 30, 2010, defendant Nangalama received and reviewed the results of another AFP test which plaintiff had undergone.  (Dkt. No. 76-6 at 10 of 52.)  The results were within range.  (Id.)

1        Defendant Nangalama next examined plaintiff on August 9, 2010.  (Dkt. No. 70-1

2  at 3.)  Plaintiff denied any fever, diarrhea or constipation.  (Id.)  Plaintiff had no nausea or

3  vomiting.  (Id.)  Plaintiff was currently taking Baraclude.  (Id.)  Plaintiff's recent viral load

4  showed that the hepatitis B was undetectable.  (Id.)  A CT scan performed on May 27, 2010

5  found no hepatocellular carcinoma.  (Id.)  A review of plaintiff's lab test showed that his LFTs

6  were improved.  (Id.)  The plan was to continue with the current medication, including a refill of

7  his Baraclude, lab tests to monitor his condition, and a follow-up.  (Id.)

8        Defendant Nangalama next examined plaintiff on September 20, 2010.  (Id.)  At

9  that time, plaintiff denied any new medical issues.  (Id.)  Defendant's assessment was liver

10  cirrhosis for which plaintiff was on the antiviral medication Baraclude and that he was doing

11  well.  (Id.)  The plan was a referral for an EGD and to the Hepatologist for a consultation.  (Id.)

12  Defendant also ordered lab tests so as to monitor plaintiff's condition and for a follow-up.  (Id.)

13        Plaintiff was seen for a consultation with the hepatitis specialist on October 4,

14  2010.  (Id. at 4.)  The specialist noted that there was no evidence of hepatocellular carcinoma on

15  plaintiff's CT scans.  (Id.)  She recommended a diet normal in protein and with low salt.  (Id.)

16  Upon plaintiff's return to prison, an order was written that he should avoid salt in his diet.  (Id.)

17        On October 14, 2010, defendant Nangalama examined plaintiff.  (Id.)  Defendant

18  noted plaintiff's history of liver cirrhosis due to chronic hepatitis B.  (Id.)  Defendant further

19  noted that plaintiff's LFP was improved.  (Id.)  Defendant's plan was for a regular follow up.

20  (Id.)

21       *Defendant Bal*

22        At all relevant times, defendant Bal was the Chief Physician Executive at CSP-

23  Sac.  (Dkt. No. 76-4 at 18.)  On at least two occasions (April 2009 and February 2010) plaintiff

24  was seen my medical specialists outside of the prison.  (Id.)  The specialists wrote letters,

25  summarizing their findings, that were addressed to defendant Bal in his capacity of overseeing

26  health care operations at CSP-Sac.  (Id.)  Because defendant Bal was not plaintiff's treating

physician, he would have forwarded those letters to plaintiff's treating physician.  (Id.)

VI.  Analysis

Plaintiff alleges defendants O'Brien, McAlpine and Nangalama failed to treat him for hepatitis B even though his medical records from Corcoran indicated that he had the disease. Plaintiff also alleges that defendant Nangalama failed to provide him with a special diet or transfer to a prison where a special diet could be provided.  Plaintiff also generally challenges defendant Nangalama's treatment of his hepatitis B.  Plaintiff alleges that defendant Bal denied his request for a special diet.  Plaintiff alleges that defendant Sahota improperly discontinued his nutritional supplement.

A.  Defendant O'Brien

Defendants move for summary judgment as to defendant O'Brien on the grounds that he did not act with deliberate indifference to plaintiff's serious medical needs.

As discussed above, it is undisputed that defendant O'Brien did not treat plaintiff for hepatitis B.  Instead, defendant O'Brien treated plaintiff for back pain, visual problems and renal failure.  It is undisputed that these ailments were not indicative of hepatitis B.  It is also undisputed that plaintiff was not treated for hepatitis B until after the liver function test performed at Mercy Folsom Hospital in June 2008 came back abnormal.

Plaintiff argues that his 2005 medical records from Corcoran showed that he had hepatitis B.  Attached to plaintiff's opposition are unauthenticated medical records indicating that on July 19, 2005, plaintiff had a blood test. (Dkt. No. 104 at 33.)  The results indicated that plaintiff's "SGOT" and "SGPT" levels were high.  (Id.)  High SGOT and SGPT levels may indicate liver disease.  See  http://www.medicinenet.com/liver_blood_tests/page2.htm.  In December 2005, a "hepatitis prof" was ordered for plaintiff. (Id. at 34.)  In his verified opposition, plaintiff alleges that a Dr. Jung ordered the profs which plaintiff claims came back positive for hepatitis B.  (Dkt. No. 104 at 4.)  Plaintiff alleges that the results of the hepatitis test were "not spoken of."  (Id.)  Plaintiff alleges that medical staff kept telling him that there was

1   nothing wrong or to be concerned about.  (Id.)

2         In the January 19, 2012 order for further briefing, the undersigned ordered

3   plaintiff to file the report from the hepatitis prof test if he had it in his possession.   Attached to

4   plaintiff's January 19, 2012 further briefing are what plaintiff claims are (unauthenticated) copies

5   of the results of a December 21, 2005 test performed at Mercy Hospital Laboratory in

6   Bakersfield, California.  (Dkt. No. 107 at 7-10.)  Although these documents contain what appear

7   to be results of tests, they state that the hepatitis prof" is "pending."  (Id. at 10.)  It is unclear

8   whether these results are from a blood test or urinalysis.  These records do not clearly state that

9   plaintiff tested positive for hepatitis B.  (Id. at 7-10.)  However, it is possible that the individual

10  test results reflected in these records indicate that plaintiff had this disease.  The undersigned is

11  not a medical expert and cannot make this determination.

12        Putting aside the issue of authentication of the medical records submitted by

13  plaintiff, it is clear that in 2005 medical officials at Corcoran suspected that plaintiff had

14  hepatitis.  The record before the undersigned does not clearly indicate the results of the 2005

15  hepatitis prof test and what Corcoran medical officials concluded from those results.  The

16  undersigned is troubled that when plaintiff was diagnosed with hepatitis B in 2009, he had

17  apparently had it for some time as it had progressed to the point where it had caused damage to

18  his liver.  However, for the reasons stated herein, the undersigned cannot find that defendant

19  O'Brien acted with deliberate indifference by failing to diagnose and or treat plaintiff for

20  hepatitis B based on the testing performed at Corcoran.[4]

21  _____

22      [4]  Plaintiff named defendant Dr. Posner as a defendant in the complaint.  (Dkt. No. 1.)
    Plaintiff alleged that defendant Posner, who worked at Corcoran, provided inadequate medical
23  care for his hepatitis B.  (Id.)  The court ordered service of defendant Posner.  (Dkt. No. 5.)  On
    April 10, 2010, defendants filed a motion to dismiss the claims against defendant Posner
24  pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 20.)  Plaintiff did not oppose
    this motion.  On May 26, 2010, the undersigned recommended that defendants' motion to
25  dismiss be granted.  (Dkt. No. 29.)  Plaintiff did not file objections to the findings and
    recommendations.  On July 7, 2010, the Honorable Frank C. Damrell adopted these findings and
26  recommendations.  (Dkt. No. 32.)  In his opposition to the pending motion, plaintiff argues that

1    As discussed above, defendant O'Brien treated plaintiff in 2007 for conditions and

2   symptoms that were not indicative of hepatitis B.  Plaintiff does not claim that he told defendant

3   O'Brien that he was concerned that he had this disease.  There is no evidence in the record that

4   defendant O'Brien was aware of the hepatitis tests performed at Corcoran.  Based on these

5   circumstances, defendant O'Brien would not have known to review plaintiff's medical records

6   from Corcoran and, in particular, the hepatitis tests that had been performed over one year before

7   his first examination of plaintiff.  Assuming plaintiff's medical records from Corcoran indicated

8   that he had hepatitis B, for the reasons discussed above, the undersigned cannot find that

9   defendant O'Brien acted with deliberate indifference to plaintiff's serious medical needs by

10   failing to diagnose and/or treat his hepatitis B.  Accordingly, defendant O'Brien should be

11   granted summary judgment.  Having found that defendant O'Brien should be granted summary

12   judgment as to the merits of plaintiff's claims, there is no need to further address the issue of

13   qualified immunity.

14    B.  Defendant McAlpine

15    Defendants move for summary judgment on the grounds that there is no evidence

16   that defendant McAlpine acted with deliberate indifference to plaintiff's serious medical needs.

17    It is undisputed that defendant McAlpine first treated plaintiff on September 5,

18   2007.  In July 2008, defendant McAlpine diagnosed plaintiff with hepatitis B after the abnormal

19   liver test results were reported from Mercy Folsom Hospital.  To the extent plaintiff argues that

20   defendant McAlpine should have diagnosed and/or treated his hepatitis B before July 2008,

21   defendant McAlpine should be granted summary judgment for the reasons stated herein.

22    Before July 2008, plaintiff did not present defendant McAlpine with symptoms

23   which were indicative of hepatitis B.  Plaintiff does not claim that he told defendant McAlpine

24

25   prison officials at Corcoran, including (former) defendant Posner failed to treat him for hepatitis
    B.  However, the claims against defendant Posner were dismissed after plaintiff failed to oppose
    the motion to dismiss made on defendant Posner's behalf.

26

1    that he had hepatitis B.  In addition, nothing in the record indicates that defendant McAlpine

2    should have known to go back and review plaintiff's medical records from Corcoran containing

3    the hepatitis tests.  For these reasons, the undersigned does not find that defendant McAlpine

4    acted with deliberate indifference by failing to diagnose and/or treat plaintiff's hepatitis B before

5    July 2008.

6              Plaintiff may also be generally challenging the treatment he received from

7    defendant McAlpine for hepatitis B after the July 2008 diagnosis.  For the reasons stated herein,

8    the undersigned does not find that defendant McAlpine acted with deliberate indifference to

9    plaintiff's serious medical needs following the July 2008 diagnosis.

10             It is undisputed that on July 15, 2008, plaintiff's hepatitis B diagnosis was

11   confirmed by the results of a lab test.  On that date, defendant McAlpine ordered an ultrasound

12   for plaintiff.  Defendant McAlpine had no further involvement with plaintiff's medical care

13   because defendant was transferred to another institution.  The ultrasound was performed on

14   September 22, 2008, apparently after defendant McAlpine had transferred to another institution.

15             Plaintiff may be arguing that defendant McAlpine should have treated him with

16   antiviral medication for hepatitis.  However, defendant McAlpine diagnosed him with acute,

17   rather than chronic, hepatitis.  As discussed in the statement of undisputed facts, antiviral

18   medication is appropriate for treatment of chronic hepatitis.  Plaintiff has presented no expert

19   evidence that defendant McAlpine acted with deliberate indifference by diagnosing him with

20   acute, rather than chronic, hepatitis B in July 2008.

21             Plaintiff may also be complaining about the approximate two month delay

22   between the time defendant McAlpine ordered the ultrasound (July 15, 2008), and when it was

23   performed (September 22, 2008).  To demonstrate deliberate indifference based on a delay in

24   medical treatment, plaintiff must demonstrate that the delay led to further injury.  McGuckin, 974

25   F.2d at 1060; see also Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2002) ("Plaintiffs could not

26   prove an Eighth Amendment violation because they have not demonstrated that delays occurred

1   to patients with problems so severe that delays would cause significant harm and that defendants

2   should have known this to be the case. . .")

3          Assuming the delay caused plaintiff to suffer injury to his liver, plaintiff has

4   presented no expert evidence demonstrating that defendant McAlpine should have known that a

5   two month delay in his receipt of the ultrasound would cause him injury.  Because defendant

6   McAlpine diagnosed plaintiff with acute, rather than chronic, hepatitis, the undersigned cannot

7   infer that defendant McAlpine should have known that a two month delay in plaintiff's receipt of

8   an ultrasound would cause serious injury.[5]

9          For the reasons discussed above, the undersigned does not find that defendant

10  McAlpine acted with deliberate indifference to plaintiff's serious medical needs.  Accordingly,

11  defendant McAlpine should be granted summary judgment.  Having found that defendant

12  McAlpine should be granted summary judgment as to the merits of plaintiff's claims, there is no

13  need to further address the issue of qualified immunity.

14          C.  Defendant Nangalama

15          Defendants move for summary judgment as to defendant Nangalama on the

16  grounds that he did not act with deliberate indifference to plaintiff's serious medical needs.

17

18          1.  Alleged Delay in Diagnosis

19          To the extent plaintiff alleges that defendant Nangalama is liable for the alleged

20  delay in plaintiff's treatment for hepatitis B based on the Corcoran medical records, defendant

21  Nangalama is not adequately linked to this claim.  By the time defendant Nangalama began

22  treating plaintiff in October 2008, plaintiff had already been diagnosed with hepatitis B by

23

24          [5]  In his declaration, defendant McAlpine states that he transferred away from CSP-Sac
    after he ordered the ultrasound but before it was given.  Defendant McAlpine does not state the
25  date he no longer worked at CSP-Sac.  For this reason, for purposes of analyzing the instant
    claim, the undersigned assumes that defendant McAlpine worked at CSP-Sac for the entire at-
26  issue two month period of time.

1    defendant McAlpine.  Accordingly, defendant Nangalama is entitled to summary judgment as to

2    this claim.  Having found that defendant Nangalama should be granted summary judgment as to

3    the merits of this claim, there is no need to further address the issue of qualified immunity.

4                         2.  Special Diet

5                  Defendants argue that defendant Nangalama did not act with deliberate

6    indifference by denying plaintiff's request for a special diet or for a transfer to a prison which

7    could provide a special diet.  In support of this argument, defendants rely on the following facts.

8                  It is undisputed that on January 22, 2009, defendant Nangalama ordered a

9    Carnation nutritional supplement for plaintiff when he discovered that plaintiff had lost weight.

10   The nutritional supplement was discontinued in July 2009, when plaintiff was at a healthy body

11   weight.  In his declaration, defendant Nangalama further stated that plaintiff did not require a

12   special diet for his hepatitis B.  It is undisputed that plaintiff did not report nausea to defendant

13   Nangalama during any of his examinations of plaintiff.  While plaintiff lost weight initially, he

14   gained the weight back and returned to a healthy weight.  These circumstances did not warrant a

15   special diet.

16                 In 2010, a hepatitis specialist recommended that plaintiff have a low salt diet.

17   According to defendant Nangalama, plaintiff could monitor his own salt intake by not adding

18   extra salt and by avoiding foods that were high in salt content.  (Dkt. No. 70-1 at 5.)  According

19   to defendant Nangalama, plaintiff did not require a transfer to a different prison in order to have a

20   low salt diet.  (Id.)

21                 Plaintiff has submitted no expert evidence demonstrating that he required a

22   special diet.  Defendants' unopposed evidence demonstrates that plaintiff did not require a

23   special diet.  Based on this evidence, the undersigned finds that defendant Nangalama did not act

24   with deliberate indifference by failing to provide plaintiff with a special diet or by failing to

25   ////

26   ////

24

1  transfer plaintiff to a prison where he could obtain a special diet.[6]  Accordingly, defendant

2  Nangalama should be granted summary judgment as to this claim.  Having found that defendant

3  Nangalama should be granted summary judgment as to the merits of this claim, there is no need

4  to further address the issue of qualified immunity.

5           3.  Adequate Treatment

6           The undersigned next considers plaintiff's claim that defendant Nangalama did

7  not provide adequate treatment for plaintiff's hepatitis B.  Plaintiff is claiming that defendant

8  Nangalama did not order various tests in a timely manner and also failed to timely prescribe

9  antiviral medications.

10           *Antiviral Medications*

11           The undersigned first considers whether defendant Nangalama timely prescribed

12  antiviral medications.  For the following reasons, the undersigned finds that defendant

13  Nangalama is not entitled to summary judgment as to this claim.

14           At the outset, the undersigned observes that the treatment for *chroni*c hepatitis is

15  antiviral medications in order to prevent liver damage.  Although defendants do not address when

16  plaintiff was diagnosed with chronic hepatitis, the liver damage reflected in the September 2008

17  ultrasound and February 2009 CT scan suggests that he had chronic, rather than acute, hepatitis B

18  as early as September 2009.

19           Defendants do not clearly address when defendant Nangalama first prescribed

20  antiviral medications for plaintiff.   The first mention of antiviral drugs in defendant

21  Nangalama's declaration is his statement that on February 28, 2009, he "noted" that plaintiff was

22  being treated with the anti-viral medication Entecavir (trade name Baraclude) (but there is no

23  statement that he actually prescribed any such medications).  (Dkt. No. 76-6 at 5.)   In contrast,

24  _____

25           [6]  The issue of plaintiff's request for a special diet was raised by plaintiff in a motion for
injunctive relief.  On November 24, 2010, the undersigned recommended that this motion for
injunctive relief be denied.  (Dkt. No. 71.)  On January 14, 2011, the Honorable Frank C.

26  Damrell adopted these findings and recommendations.  (Dkt. No. 73.)

25

1  UC Davis Dr. Rosarro, who examined plaintiff on May 11, 2009, recommended that plaintiff

2  start antiviral medications "ASAP." (Dkt. No. 104, part 2 at 42.)  When listing plaintiff's current

3  medications, Dr. Rosarro did not list antiviral medications, as he was clearly under the

4  impression that plaintiff was not taking any.  (Id. at 40.)  Dr. Rosario also noted that plaintiff's

5  hepatitis B viral load was high.  (Id. at 42.)

6          Viewing the facts in the light most favorable to plaintiff, the undersigned finds

7  that defendant Nangalama violated plaintiff's Eighth Amendment rights by not prescribing

8  antiviral medication before May 11, 2009.  The ultrasound performed on plaintiff's liver in

9  September 2008 showed lesions.  The CT scan performed on plaintiff's liver in January 2009

10  showed cirrhosis.  By not prescribing antiviral medication when tests showed damage to

11  plaintiff's liver, defendant Nangalama failed to prevent the hepatitis B from causing additional

12  liver damage.

13          Having found that defendant Nangalama violated plaintiff's constitutional rights,

14  the undersigned considers the second prong of the qualified immunity test: whether a reasonable

15  official would have known that failing to prescribe the antiviral medication before May 11, 2009

16  violated plaintiff's Eighth Amendment rights.

17          According to defendants, antiviral medication is the only medication for treating

18  hepatitis B.  The purpose of prescribing the medication is to prevent liver damage.  Considering

19  that plaintiff's liver showed signs of damage in October 2008 and January 2009, the undersigned

20  finds that a reasonable doctor would have known that failing to prescribe antiviral medications to

21  plaintiff before May 2009 violated the Eighth Amendment.  Accordingly, defendant Nangalama

22  should not be granted qualified immunity.

23          For the reasons discussed above, defendant Nangalama should not be granted

24  summary judgment as to this claim.

25          *Alleged Delay in Testing*

26          Plaintiff also generally alleges delays in various tests.  The undersigned has

26

1 identified two notable delays.

2      First, the record reflects a delay in plaintiff's receipt of the CT recommended by

3 the radiologist who performed the ultrasound on September 22, 2008.  In the report from this

4 ultrasound, the radiologist wrote, "that "primary hepatocellular carcinoma or metastatic disease is

5 not excluded." (Dkt. No. 76-5 at 30.)  The radiologist recommended a CT scan of the liver.  (Id.)

6      On October 9, 2008, defendant Nangalama referred plaintiff for a "CT for a liver

7 biopsy." (Dkt. No. 76-6 at 3.)  On January 13, 2009, defendant Nangalama requested an

8 abdominal CT scan because plaintiff complained of abdominal pain.  (Id. at 4.)  Plaintiff received

9 the abdominal CT scan on January 20, 2009.  (Id.)

10      The abdominal CT scan performed January 20, 2009, apparently included the CT

11 scan of the liver recommended by the radiologist in September 2009, because defendant states

12 that results of the CT scan showed a cirrhotic liver.  (Id.)  The record contains no reference to any

13 other CT scan performed on plaintiff's liver prior to that time.  The January 2009 radiology

14 report states that plaintiff had a cirrhotic liver with numerous regenerating nodules.  (Id. at 25.)

15 The report also states that a small lesion was seen on the liver, the exact nature of which was

16 unclear.  (Id.)  The report states that the lesion may represent a vascular abnormality but the

17 remote possibility of HCC cannot be ruled out.  (Id. at 25-26.)  It was recommended that plaintiff

18 receive a follow-up scan in 3-6 months.  (Id. at 26.)

19      To succeed on the instant claim, plaintiff must demonstrate that he suffered an

20 injury as a result of the approximate four month delay from the time the radiologist

21 recommended that he receive a CT of his liver on September 22, 2008, to when he received it on

22 January 20, 2009.  The radiologist wrote that the purpose of the CT scan was to determine

23 whether plaintiff had cancer or metastatic disease.  Plaintiff did not have cancer and there is no

24 indication in the record that he was diagnosed with metastatic disease.  Because plaintiff did not

25 have these diseases, he cannot demonstrate an injury caused by a delay in their diagnosis.

26 Accordingly, because plaintiff had not demonstrated that he suffered any injury as a result of the

1  delay in his receipt of the CT scan recommended by the radiologist in September 2008, defendant

2  Nangalama should be granted summary judgment as to this claim.

3          The second delay the undersigned has found in the record is for the CT and alpha

4  fetoprotein ("AFP") test ordered by UC Davis on February 24, 2010.  The CT was ordered

5  because plaintiff had a history of enhancing liver lesions.  On April 16, 2010, defendant

6  Nangalama completed plaintiff's referral for this CT scan.  The CT test was performed on May

7  27, 2010. (Dkt. No. 50-2 at 6.)  The scan found no change in the lesion on the right lepatic lobe

8  and no evidence of cancer.  (Id.)  The results of the AFP test were "within range."  (Id. at 3.)

9          Although there was a three month delay in plaintiff's receipt of the CT and AFP

10  tests ordered by UC Davis, plaintiff suffered no injury as a result of the delay.  The tests were to

11  determine whether plaintiff's condition had worsened or otherwise changed, which it had not.

12  Accordingly, defendants should be granted summary judgment to the extent plaintiff alleges a

13  claim based on this delay in his receipt of tests.

14          The undersigned has reviewed the record and does not find any other significant

15  delays of treatment involving defendant Nangalama.  Plaintiff is stable and apparently doing well

16  on the antiviral drugs.  Plaintiff also does not have cancer.  The delay of concern is the possible

17  delay in plaintiff's receipt of antiviral medication, which may have caused additional liver

18  damage.  For these reasons, the undersigned recommends that defendant Nangalama be granted

19  summary judgment except for plaintiff's claim alleging delay in the receipt of antiviral

20  medication.

21          D.  Defendant Bal

22          Defendants move for summary judgment as to defendant Bal on the grounds that

23  he was not deliberately indifferent to plaintiff's serious medical needs.  Defendants argue that

24  defendant Bal's only involvement with plaintiff's medical care was to forward, on at least two

25  occasions, letters from outside consultants regarding plaintiff's medical care to plaintiff's treating

26  physicians.  Defendants argue that plaintiff is improperly attempting to base defendant Bal's

1   liability on his role as defendant Nangalama's supervisor.

2             In his opposition, plaintiff argues that defendant Bal denied his administrative

3   grievance requesting a special diet for his hepatitis B.  Attached as exhibit X to plaintiff's

4   opposition is what appears to be the last page from defendant Bal's response to this grievance.

5   (Dkt. No. 43 at 88.)  In the response, dated July 28, 2010, defendant Bal denied plaintiff's request

6   for a special diet.  (Id.)

7             The undersigned does not find that defendant Bal acted with deliberate

8   indifference to plaintiff's serious medical needs when he forwarded the outside specialist letters

9   to plaintiff's treating physicians.  Plaintiff makes no claim against defendant Bal based on these

10   letters.

11             To the extent plaintiff is basing defendant Bal's liability on his role as defendant

12   Nangalama's supervisor, supervisory personnel are generally not liable under § 1983 for the

13   actions of their employees under a theory of respondeat superior and, therefore, when a named

14   defendant holds a supervisorial position, the causal link between him and the claimed

15   constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

16   (9th Cir. 1979) (no liability where there is no allegation of personal participation); Mosher v.

17   Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979) (no liability where

18   there is no evidence of personal participation).  Vague and conclusory allegations concerning the

19   involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board

20   of Regents, 673 F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual allegations of

21   personal participation is insufficient).  Accordingly, defendant Bal is not liable simply based on

22   his role as defendant Nangalama's supervisor.

23             Regarding defendant Bal's denial of plaintiff's administrative grievance

24   requesting a special diet, the undersigned above found that defendant Nangalama did not violate

25   plaintiff's Eighth Amendment right to adequate medical care by denying his request for a special

26   diet.  As discussed above, defendants have presented unopposed expert evidence that plaintiff did

1    not require a special diet.  For these reasons, defendant Bal did not violate plaintiff's Eighth

2    Amendment rights by denying plaintiff's grievance requesting a special diet.

3            For the reasons discussed above, defendant Bal should be granted summary

4    judgment.  Having found that defendant Bal should be granted summary judgment as to the

5    merits of these claims, there is no need to further address the issue of qualified immunity.

6            E.   Defendant Sahota

7            Plaintiff argues that defendant Sahota improperly discontinued his nutritional

8    supplement.

9            Defendants argue that defendant Sahota should be granted summary judgment

10   based on plaintiff's failure to timely respond to a request for admissions as to this defendant.

11   Defendants argue that the failure to timely respond to a request for admissions results in

12   automatic admission of the matters requested.  See Fed. R. Civ. P. 36(a)(3) (a matter is admitted

13   unless, within 30 days after being served, the party to whom the request is directed serves a

14   written answer or objection).  Defendants states that plaintiff failed to respond to requests for

15   admissions propounded by defendant Sahota and has thus admitted that he has no facts to support

16   his claims against this defendant.

17           Defendants go on to address plaintiff's claim that defendant Sahota took him off a

18   nutritional supplement.  It is undisputed that a nurse practitioner, not defendant Sahota,

19   discontinued the nutritional supplement after plaintiff's health had improved to the point where

20   he no longer met the criteria for the nutritional supplement.

21           Plaintiff's opposition does not address the motion for summary judgment made

22   against defendant Sahota.  Plaintiff does not oppose defendants' claim, and evidence, that

23   defendant Sahota was not responsible for taking plaintiff off the nutritional supplement.  For this

24   reason, the undersigned finds that there is no factual basis for plaintiff's claim against defendant

25   Sahota.  Accordingly, the motion for summary judgment by defendant Sahota should be granted.

26   Having found that defendant Sahota should be granted summary judgment as to the merits of

1   these claims, there is no need to further address the issue of qualified immunity.

2          Accordingly, IT IS HEREBY RECOMMENDED that defendants' summary

3   judgment motion (Dkt. No. 76) be granted, except for the claim that defendant Nangalama did

4   not timely prescribe antiviral medications.

5          These findings and recommendations are submitted to the United States District

6   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

7   one days after being served with these findings and recommendations, any party may file written

8   objections with the court and serve a copy on all parties.  Such a document should be captioned

9   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

10  objections shall be filed and served within fourteen days after service of the objections.  The

11  parties are advised that failure to file objections within the specified time may waive the right to

12  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13  DATED:  March 19, 2012

14

15                                    _____
                                      KENDALL J. NEWMAN
16                                    UNITED STATES MAGISTRATE JUDGE

17  wag3166.sj

18

19

20

21

22

23

24

25

26